**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| **SUSAN HARP** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No:_____ |
| | ) | |
| | ) | |
| **EQUIFAX INFORMATION SERVICES, LLC** | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Susan Harp, by and through counsel, brings this Complaint against Defendant Equifax Information Services, LLC. ("Defendant" or "Equifax") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.     Susan Harp had separated and was in the process of obtaining a divorce when her soon to be ex-husband (Roger Skidmore) went online to a same day funding company that promises an easy application process that is ideal for an identity thief. Rather than have to submit proof of identity like a driver's license or passport, Rocket Loans or Rockloans "usually verifies its applicants' information electronically, so you won't have to worry about uploading or emailing documents." These loans are originated by a New Jersey State charted bank (Cross River Bank) and usually have large origination fees and APRs. Any identity thief that has access to someone else's personal information (like an ex-spouse) can easily apply for such loans and be approved. In this particular case, the thief created a fictitious email address for Ms. Harp that she had never used, completed the application and walked away with $32,557 in loan proceeds. Mr. Skidmore used his office address in the application as well as his cell phone number. Ms. Harp, however, had nothing to do with the loan and never benefitted from the proceeds. When she discovered the

fraudulent loan in her name, she confronted her soon to be ex-husband, and he claimed that it must have been put in her name mistakenly, that it was supposed to be a loan for his company and that he would take care of the mistake. Of course, he never did, and the loan remained in her name and on her credit report. Mr. Skidmore made limited payments on the loan and accepted responsibility for the debt in the couple's divorce decree. Ms. Harp notified Rockloans of the fraud and while they were somewhat sympathetic, they were unwilling to remove her from the account or correct the credit reporting even though they were aware of Mr. Skidmore's involvement. Ms. Harp proceeded to file an identity theft report with the Austin Police, an FTC Fraud affidavit, and disputed the trade line directly with Equifax. Initially, Equifax relied upon the fraud affidavit and police report to delete or suppress the Rockloans account, his work address and his phone number, but thereafter decided to reinstate the account and place it back on her credit file. Despite the fact that Ms. Harp had done everything that she could to report and dispute the fraudulent account and notified both Rockloans and Equifax that this was opened by her ex-husband using a fictitious email address and providing both a police report and FTC affidavit, Equifax would not correct its credit reporting and remove this clearly fraudulent account from her credit file. Ms. Harp had fully complied with §1681c-2 and submitted both an FTC affidavit and a valid and detailed Police Report, proof of her identity (driver's license), identified the Rockloans account and notified Equifax on multiple occasions that this was not her account, that she did not sign or apply for it and that Equifax needed to remove it from her credit file. Without any factual basis for declining her identity theft reports as set forth in 1681c-2(c), Equifax refused to block the account and notified her by letters dated June 6, 2025, October 8, 2025 and October 9, 2025, that in order for Equifax to block the information that she would need to: "provide proof of her identity, the specific information that is the result of the identity theft and a copy of your complete and submitted

2

identity Theft Report." Ms. Harp had already done that multiple times and Equifax falsely represented on multiple occasions that the basis for not blocking the identity theft account was her failure to comply with the provision of 1681c-2(a) when she clearly had and Equifax failed to provide any valid basis pursuant to 1681c-2(c) for declining to block the disputed trade line. After multiple dispute attempts failed to correct the trade line, Ms. Harp had no alternative other than to file the subject complaint. Equifax, unfortunately, has elected to put profits over people and accuracy to increase its bottom line by outsourcing its grave responsibility to investigate and/or reinvestigate disputed credit file data to ensure maximum possible accuracy. As a result, it has created a system that caters to the wants and needs of its customers (furnisher entities like Rockloans) and ignores the rights of consumers like Ms. Harp. Accordingly, Ms. Harp requests an award of actual damages, statutory damages, punitive damages, attorney's fees and costs based upon Equifax's violations of the Fair Credit Reporting Act 15 U.S.C. §1681 *et seq.*

### Parties

2.      Plaintiff Susan Harp is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because she is an individual. Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Susan Harp.

3.      Defendant Equifax Information Services, LLC, (hereinafter "Equifax"), is a foreign limited liability company with a principal office address in Georgia. Equifax is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties. Equifax regularly conducts these business activities in the Eastern District of Virginia by providing credit

reports and other products to consumers and businesses in the Alexandria division of the Eastern District of Virginia.

## Jurisdiction & Venue

4.      This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681(p).   Venue is proper in this jurisdiction.   The plaintiff has contacts with the Alexandria Division of the Eastern District of Virginia.  Ms. Harp works and travels in Virginia, and she mailed the credit dispute letters to Equifax from Alexandria, Virginia and that forum is the forum most convenient for the adjudication of her claims.

## Factual Allegations

5.      Susan Harp is the victim of identity theft related to an account with Rocket Loans that was opened by her former spouse.  Ms. Harp has fought very hard to prove her innocence of the loan so that Equifax would stop reporting the loan on her credit file.  Unfortunately for Ms. Harp, Equifax will not remove the identity theft related loan from her Equifax credit file when another consumer reporting agency has removed the loan from her credit file.

6.      Ms. Harp's ex-husband (Roger Skidmore) opened a credit account with Rocket Loans (also referred to as Rockloan in Equifax credit file data) in her name on or about August 1, 2023.  The parties had separated earlier in the year on April 12, 2023 with the marriage ending in a divorce on December 23, 2023.

7.      Mr. Skidmore is believed to have opened the Rockloan account by creating a new email address for Ms. Harp and thereafter using her personal identifying information without her authorization or permission.  When he applied for the loan he used his own cell phone number and his office address.  The email address associated with the account was harpsusan12@gmail.com, which is not and never has been her email address or an email address that she opened or used.

4

8.    When Ms. Harp confronted her ex-husband about the Rocket Loan account appearing in her name, he stated that Rocket Loans must have put her name on by mistake and that the loan was really for his company EDX.  Mr. Skidmore stated that he would have her name taken off the loan.  As part of the divorce agreement, he accepted responsibility for this debt.

9.    In early 2024, Ms. Harp learned that the Rocket Loans account had not been paid since October 2023 and as appearing as a charge off on her Equifax credit report.  Ms. Harp then contacted Rocket Loans, who informed her that the loan was taken out in her name and not Mr. Skidmore's.  Ms. Harp believed that Mr. Skidmore could obtain the loan in her name only because he had access to all of her identifying information over the course of their marriage.

10.    Mr. Skidmore likely needed the funds to help his ailing company.  During that period of time he faced multiple lawsuits and judgments were being entered against him.

11.    On March 27, 2024, Ms. Harp notified Rocket Loans via email about the identity theft and that her ex-husband had opened the account without her knowledge or involvement.  She told Rocket Loans that her ex-husband had opened the account and that she did not sign for the loan or receive the benefit of the proceeds.  She also noted that her ex-husband had tried to get a mortgage at the same time but that loan could not be consummated because she would have had to appear in person for the mortgage loan.  She attached to the email a copy of the FTC theft affidavit, proof of submittal of an Austin Texas police report, and a copy of her driver's license.

12.    Horrified that the account was in her name only instead of an account with Mr. Skidmore and his company as the primary and her inadvertently added, Ms. Harp filed a police report with the Austin Texas police department on March 27, 2024.  The official police report was 2024-9005383 and named the Rocket Loans account in the amount of $36,816 as the account opened via identity theft.

13. On March 27, 2024, Ms. Harp also completed the Federal Trade Commission's Identity Theft Report. She identified the Rockloans Marketplace account as identity theft related and named her ex-husband Roger Skidmore as the suspect.

14. On April 2, 2024, Rocket Loans sent a brief letter to Ms. Harp and told her that it found no evidence of fraud and denied her identity theft claim. This decision made no sense because the response was almost immediate and did not identify any facts to contradict the facts that Ms. Harp had provided in her initial email communication. Specifically, there was no indication that it had investigated the fraudulent email address used to open the account or the fact that it was opened using Mr. Skidmore's office address and phone number.

15. After receiving the communication from Rocket Loans, Ms. Harp notified them that their research was insufficient because she was not the owner of the email, phone, computer, or suspected bank account used in the loan crime. Ms. Harp also requested detailed information about what information Rocket Loans investigated.

16. On April 2, 2024, Rocket Loans responded with its rationale for the decision stating that the account was not identity theft with justifications for denial that completely ignored how identity theft occurs. Rocket Loans stated that information only a consumer would know like a social security number, details about income, a valid bank account, and the mailing address were the reasons it determined that she opened the account. The logic completely ignored the fact that all identity theft happens in this fashion because knowledge of that information is the necessary requirement to commit identity theft. In addition, familial identity theft will always have the thief knowing this information because of the prior personal relationship.

17. Ms. Harp responded to that email by telling Rocket Loans that she was married for 20 years, and her husband had access to her purse and personal information. She went on to remind

Rocket Loans that Mr. Skidmore had apparently been contacting them to straighten out the loan and make payment arrangements, and this fact also corroborated her claims that she did not open the account.

18.    Ms. Harp sent another email that stated Mr. Skidmore claimed to have called Rocket Loans to discuss how to resolve the loan. Ms. Harp was skeptical of this information and was concerned that Mr. Skidmore had used his male to female voice converter to impersonate her over the telephone. She asked if Rocket Loans had recorded the conversation or tried to contact her directly. She warned Rocket Loans that her husband was tech savvy and stated that she suspected him of draining her children's 529 accounts.

19.    On April 3, 2024, Ms. Harp emailed Rocket Loans again and said that Roger Skidmore had agreed to make payments on the loan and that the loan was incorrectly listed in her name. She noted that any payments made on the account were made by Mr. Skidmore and not her.

20.    Equifax typically defends cases on the grounds that furnishers like Rocket Loans are reliable furnishers of credit data, but Rocket Loans' response to Ms. Harp demonstrated that it is anything but a reliable furnisher because the very circumstances it claims were not evidence of identity theft are the exact items that cause identity theft in the first instance. Rocket Loans has no reasonable criteria to investigate identity theft based on the decisions that it made in this case. Equifax cannot reasonably argue that Rocket Loans is a reliable furnisher of credit data given the events that transpired as to the account at issue in this action.

21.    Equifax has a duty to conduct an independent investigation, which it ultimately failed to do in this case because Equifax would ignore the FTC theft report and police report and reinsert and deny deletion of the Rocket Loan account from Ms. Harp's credit report.

7

22.    On April 4, 2024, Rocket Loans sent Ms. Harp a copy of the promissory note related to the loan. The loan identified Cross River Bank as the Lender for the loan, and the document was electronically signed with a click and not a hard ink signature. The fraudulent email address harpsusan12@gmail.com was the email where the copy of the digitally signed document was sent. This is further proof that Ms. Harp had nothing to do with the loan. Cross River Bank has relatively limited physical locations, and it is known as technology driven bank that relies on electronic lending with Rocket Loans typically originating the loans.

23.    Ms. Harp continued to try and get Rocket Loans to remove the loan from her name, but they never would. Based upon information and belief, Mr. Skidmore made payments on the loan in late 2024.

24.    In February 2025, Ms. Harp began the process of attempting to have the accounts removed from her credit files because Rocket Loans was not helpful in removing the account from her name and credit. Discovery is necessary as any telephonic disputes that Ms. Harp made to Equifax in February 2025. In any event, the Rocket Loans account remained on her credit report, and she began sending written disputes in May 2025 to Equifax.

25.    On May 29, 2025, Ms. Harp sent a written credit dispute package to Equifax in an effort to have the disputed Rocket Loan account removed from her credit file. In the letter, she told Equifax that she was the victim of identity theft and had been disputing the Rockloan Marketplace account for more than a year with no success. Ms. Harp described the circumstances related to the identity theft including how her ex-husband had opened up the account using her personally identifying information. She described the fact that she had never used the email address associated with that account. She also identified the fact that she had filed a police report with Case No. 2024-9005383 with the Austin Police Department related to the loan. She stated

8

that she had nothing to do with loan and that she did not benefit from the proceeds for the loan. She included a copy of her FTC identity theft affidavit, a copy of the summary of the police report, a photo copy of her driver's license information and the clear identification of the fraudulent Rocket Loans account. That dispute letter with the attachments satisfied all the elements of a fraud blocking dispute pursuant to 1681c-2(a). She mailed this credit dispute package to Equifax via regular mail and certified mail return receipt requested.

26.    Ms. Harp mailed the Equifax credit dispute packages from the George Mason Station post office in Alexandria Virginia on May 29, 2025, and she paid $10.72 in postage for the certified mail return receipt requested postal package. Ms. Harp spends time for work at the company's primary location in Virginia, and she has regular contacts with the Commonwealth of Virginia because of her employment. She is also anticipating moving to Northern Virginia to be closer to the home office.

27.    Equifax received a copy of the certified mail return receipt request of the credit dispute package on June 3, 2025.

28.    On June 6, 2025, Equifax issued a letter to Ms. Harp that stated it received her request concerning the blocking of certain identity theft related information. Equifax declined to block the information pursuant to 605B(c) of the Fair Credit Reporting Act. Equifax failed to identify any of the reasons for declining to block a fraudulent account as set forth in §1681c-2(c)(1) and instead falsely stated that in order for Equifax to block the information that she would need to: "provide proof of her identity, the specific information that is the result of the identity theft and a copy of your complete and submitted identity Theft Report." That was not a basis for refusing to block the disputed account pursuant to 605B(c)/§1681c-2(c) and was demonstrably false in that she had provided Equifax with all of those items and fully satisfied the elements of §1681c-2(a).

9

Thus, Equifax not only failed to block the disputed trade line as mandated by 1681c-2(a), but it falsely represented that she needed to do more or send in information that she had already included.

29. On June 17, 2025, Equifax mailed file confirmation number 5168501716 to Susan Harp. The communication stated that Equifax was "pleased to let you know that the results of the dispute you recently filed with Equifax are complete." The communication went on to state that Equifax deleted a fraud inquiry related to digital federal credit union on August 2, 2023, that the name Roger Ray Skidmore was not currently reporting on her credit file, that Rockloans Marketplace account number *336 was not reporting on the file and that a phone number ending in this last four digits 9894 was not reporting on the credit file.

30. On June 27, 2025, Equifax sent another communication to Ms. Harp that notified her that Equifax reinserted the derogatory identity theft related Rockloans Marketplace account on her credit report. The communication stated in part, "As a result of a dispute you submitted, the account listed below was removed from your Equifax credit file. The company that furnished the account information recently requested to have the account information reinserted on your Equifax credit file and submitted a certification that the account belongs to you and the information is complete and accurate. As a result, and based on this certification, Equifax has reinserted the account on your Equifax credit file as reported by the company." As a result, Ms. Harp's Equifax credit file contained a charged off account with the past due amount of $15,669 on her credit file. Equifax would have reinserted this account despite having full knowledge of the police report, FTC identity theft affidavit, and the circumstances resulting in Ms. Harp's former husband stealing her identity and obtaining this fraudulent loan.

31. Equifax should have blocked the account from her credit file and/or required Rockloan Market place account to provide substantial and detailed information prior to allowing

the account to be reinserted on her Equifax credit file. Given the allegations, Rocket Loans should have been required to verify that the email address was legitimate and belonged to Ms. Harp.

32.     On September 22, 2025, Ms. Harp obtained a copy of her Equifax consumer file disclosure. Equifax continued to report the identity theft related Rockloans Marketplace loan in her credit file. At this point in time, the amount past due was $18,010 with a charge off status reported since February 2024. Thus despite her dispute letter that fully complied with the elements and requirements of the blocking statute, Equifax violated its duty to block the fraudulent account.

33.     On September 25, 2025, Ms. Harp made another dispute of the Rockloan Market place account. In this letter, she stated that she provided new information in the form of an official copy of the police report that was filed and processed by law enforcement officials. The letter noted that the police report included her sworn statement. She also included another copy of the loan document that she received from Rocket Loans and Cross River Bank that demonstrates that the loan document was not signed by her and is instead signed electronically. That letter (just like the prior one) with the attachments fully satisfied the blocking statute: §1681c-2(a). She also noted that the email address used to open the account is not an email address that she has ever used. She again identified the facts that her ex-husband had opened up the account by using her personal identifying information. She also referenced her FTC affidavit of fraud and requested that Equifax delete the account from her credit file for fraud. Finally, the letter concluded with a request that Equifax identify any facts that it had to verify that this was her account.

34.     On October 8, 2025, Equifax sent a communication to Ms. Harp that stated Equifax would not block the identity theft related account from her credit report. Just like the prior communication on June 6, 2025, Equifax did not invoke or identify any of the reasons for not blocking the account as set forth in 1681c-2(c) and instead falsely stated that in order for Equifax

11

to block the information that she would need to: "provide proof of her identity, the specific information that is the result of the identity theft and a copy of your complete and submitted identity Theft Report." Once again Equifax misrepresented what Ms. Harp needed to do and failed to identify any basis for declining to block the trade line as identified in §1681c(c).

35.    On October 9, 2025, Equifax sent yet another letter that it would not be blocking the account for identity theft. That letter was identical to the one the prior day dated October 8, 2025, and misrepresented the reason for not blocking the disputed account and what Ms. Harp would need to do if she wanted Equifax to block the account.

36.    Finally, Equifax sent a third correspondence dated October 9, 2025, which was the results of the dispute that she had filed with Equifax. The result stated that the name Roger Ray Skidmore was not on the credit file, the disputed address of "USA" was not on her Equifax credit file, that Digital Federal Credit Union was not currently reporting on the credit file and that a phone number with the last four digits 9894 was not reporting on the credit file. Equifax's response was non sensical because there was no dispute of a "USA" address, Digital Federal Credit Union was not an account in dispute, and Equifax never stated what the results of the Rockloans Marketplace account investigation were despite the fact that another letter dated that same day said the dispute was open. Given Equifax's nonsensical response and failure to respond at all about the disputed account, Equifax's results of reinvestigation was functionally no response at all to the material issue of the identity theft related to the Rockloans Marketplace account reporting on Ms. Harp's credit file.

37.    Ms. Harp was frustrated that Equifax would not simply block and remove the Rockloans Marketplace account from her credit file because Experian had removed the account and not reinserted the account into her credit file. Equifax's failure to remove the account was

very distressing to Ms. Harp. Equifax caused her to have a harder time moving on with a separate financial life after her divorce because Equifax would not remove the account from her credit file. All of this was causing her significant and unnecessary additional distress and frustration.

**COUNT I**
**Fair Credit Reporting Act**
**15 U.S.C. §1681i**

38.     Plaintiff incorporates paragraphs one (1) through thirty-seven (37) as if fully stated herein.

39.     Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA. Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681i by failing to comply with the enumerated statutory provisions when Ms. Harp disputed the accounts as described in the factual averments.

40.     Equifax's reinvestigation procedures do not comply with the stated statutory requirements of 15 U.S.C. §1681i(a)(1) through §1681i(a)(6).

41.     §1681i(a)(1)(A) provides that upon notice of the dispute that Equifax is obligated to: "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate."

42.     §1681i(a)(2) obligates Equifax to: "provide notification of the dispute to any person who provided any item of information in dispute."

43.     §1681i(a)(4) details the scope of Equifax's reinvestigation under paragraph (1) and makes clear that Equifax Information Solutions, Inc. "shall review and consider all relevant information submitted by the consumer…with respect to such disputed information."

13

44.     Finally, §1681i(a)(5) provides that after Equifax has completed the forgoing steps and reinvestigation that if: "an item of information is found to be inaccurate or incomplete or cannot be verified," Equifax must delete or modify the information.

45.     §1681i(a)(6) states that the CRA (Equifax) "shall provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation."

46.     Equifax violated 15 U.S.C. §1681i(a)(1) by its conduct related to Ms. Harp's disputes that it received as identified in the factual averments. With regards to the disputes, Ms. Harp informed Equifax that the Rockloans Marketplace account was opened by her ex-husband. Thereafter, Ms. Harp informed Equifax of the exact problem and on multiple occasions provided a detailed description of the identity theft and provided police reports and an FTC Identity Theft affidavit.

47.     Equifax could have investigated the objectively verifiable facts that the email address used to open the account was not Ms. Harp's email account; that there was no personally signed loan contract and only an electronic signature, and that Mr. Skidmore would have made any payments on the account. Equifax never investigated any of these facts and simply issued an ACDV and moved on to the next automated dispute investigation. Even with a valid police report and FTC affidavit, Equifax elected to take the side of an online lender that does not maintain reasonable procedures to prevent identity theft.

48.     As part of the reinvestigations, Equifax negligently and recklessly ignored how its own data corroborated what Ms. Harp told Equifax about the identity theft. Moreover, Equifax would ignore Ms. Harp's rights as a verified identity theft victim by not deleting the account as unverifiable given the information provided by her. Worse yet, it misrepresented what Ms. Harp

14

would need to do to block the account and when she did that a second time in September 2025, it once again refused to block and told her to send in the exact same information.

49.    As part of the reinvestigations, Equifax negligently and recklessly ignored the Austin Police Report even though it met all the requirements of its own internal policies for validity and acceptance.  In addition, Equifax ignored the FTC identity theft report.  Equifax never identified one of the elements of 1681c-2(c)

50.    Based upon documents reviewed to date, and Equifax's own disclosure to Ms. Harp as to what it did do, Equifax simply issued an ACDV to Rockloans and did not conduct any other reinvestigation.  By reinserting the information in Ms. Harp's credit file, Equifax proved that it would only take the furnishers' view in the dispute and investigation.  This one-sided view of dispute reinvestigation is the type of fact pattern that leads to punitive damage verdicts for parroting information reported by a furnisher instead of conducting a proper reinvestigation.

51.    This type of reinvestigation is a sham, reckless and/or negligent reinvestigation because Equifax failed to conduct an independent reinvestigation as required by the FCRA.  In the disputes, Ms. Harp identified the facts supporting the identity theft, the police report, and the FTC IdenityTheft affidavit.  No reasonable reinvestigation would have failed to consider the facts, the police report, and the fact that a proper reinvestigation would have discovered the facts that the loan was only digitally signed and there is no physical proof that loan documents were ever provided to Ms. Harp because of the invalid email address.  Any online lender that wants to certify that an account was opened by the disputing consumer that has sworn to authorities that she did not open the account, should be obligated to produce valid identification documentation to refute the identity theft claim.

15

52.    The FCRA requires that in conducting its reinvestigation under 15 U.S.C. §1681i(a)(1)(A) that a credit reporting agency must conduct the reinvestigation after receiving the consumer's credit dispute letter and unless it is able to verify said information Equifax must delete the disputed account from the credit file as stated in 15 U.S.C. §1681i(a)(5)(A):

> In general If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or **cannot be verified**, the consumer reporting agency shall- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer. 15 U.S.C. §1681i(a)(5)(A) (emphasis added)

53.    According to Black's Law Dictionary, the ordinary meaning of verify is, "to prove to be true; to confirm or establish the truth or truthfulness; to authenticate."

54.    Based upon the circumstances, Equifax knew that Ms. Harp alleged that her ex-husband opened the loan, knew she filed a police report, and knew that she filed an FTC Identity Theft affidavit, all of these circumstances were enough that a reasonable credit reporting agency would permanently delete the account from her credit report and not allow it to be reinserted.

55.    Rather than undertake a more reasonable and detailed reinvestigation, Equifax likely contracted for an outsourced third-party processor to issue a coded dispute to Rockloans with Equifax's computers "verifying" the information with no meaningful reinvestigation after receiving the ACDV response from the furnisher of the information.

56.    Equifax also violated 15 U.S.C. §1681i(a)(4) after receiving Ms. Harp disputes because it failed to review and consider the dispute information provided by Ms. Harp including the representations that an identity thief initiated the account and that she had filed an identity theft police report with the Austin Police.

16

57. Because Equifax uses outsourced third-party processors employed by Teleperformance, Equifax incentivizes low-cost review at the expense of detailed review and consideration of the specifics of the disputes. These processors are not provided with adequate training and supervision so that they can execute the functions of §1681i(a)(4) and (5). Moreover, Equifax does not directly monitor the actions of the processors or take disciplinary action against the workers not performing to acceptable standards.

58. Rather than allow these processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Equifax automates that process and simply sends the ACDV response to its computer for automated updating and processing.

59. As a result, Equifax fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange.

60. Equifax negligently and recklessly implemented a system with a total disregard for the requirements of §1681i(a)(5). Rather than allow these processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Equifax automates that process and simply sends the ACDV response to its computer for automated updating and processing.

61. Had the Equifax processors been properly trained and supervised, they would have followed the policy concerning police reports and deleted the disputed trade line information. They also would not have issued deceptive and misleading letters that claimed that Equifax would not block the disputed account because she failed to send in all the required information/documentation.

62. Equifax fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange without reasonably considering what information it had in front of it and what it could see was the cause of the disputed data.

63. If Equifax determined that the information was too difficult to verify for purposes of the dispute, the proper response is to delete the information as unverifiable. Instead, Equifax defaults to the furnisher's ACDV response no matter how ridiculous or inconsistent. Equifax's uncritical difference to furnishers' ACDV responses to disputed information violates its independent investigation obligations under the FCRA.

64. Ms. Harp suffered actual damage including time spent addressing the problem, improper denial of access to credit, inability to use her credit, inconvenience, as well as emotional distress damages with attendant physical manifestations. In addition, punitive damages are appropriate and necessary based upon Equifax's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

65. Based upon information and belief and documents reviewed in other cases, Equifax has a pattern and practice of failing to require the steps of a reasonable reinvestigation as required by the FCRA to circumvent its duties under the FCRA to conduct reinvestigations and keep the costs of dispute reinvestigations low.

66. Equifax has been on notice of its failure to reinvestigate properly by virtue of other cases and court opinions, and only the imposition of substantial punitive damages will change Equifax's policies. Equifax also knows that outsourced automated data conformity reviews do not comply with its grave responsibilities to assure maximum possible accuracy of consumer credit information.

## COUNT II
## Fair Credit Reporting Act
## 15 U.S.C. §1681e(b)

67.     Plaintiff incorporates paragraphs one (1) through sixty-six (66) as if fully stated herein.

68.     Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report.

69.     Equifax willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Ms. Harp when it provided a credit reports to Capital One on August 21, 2025 and Truist Bank on August 20, 2025.  Discovery is necessary related to additional occasions on which Equifax issued an inaccurate credit report.

70.     Equifax's publishing of inaccurate information was a substantial factor in the stress and strain from knowing that she was unable to qualify for credit on terms and in the manner requested.  Equifax allowed the inaccurate, misleading, derogatory Rockloans account information to remain on Ms. Harp' credit report and included it in any credit information that her creditors had ordered from Equifax.

71.     Ms. Harp suffered actual damages including time spent addressing the problem, inconvenience, improper denial of access to credit, as well as emotional distress damages with attendant physical manifestations.  In addition, punitive damages are necessary based upon

19

Equifax's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

72.    Punitive damages are necessary because Equifax has implemented a system and process that it knows results with inaccurate credit reports being sold to furnishers because Equifax fails to invest the resources into enacting procedures to protect consumers or properly supervising these processors to ensure that they are carrying out and following Equifax's existing procedures. Equifax has implemented procedures to allow sham investigations, uncritical difference to furnisher responses to ACDVs, and inaccurate data to remain in its system that cannot be verified independently.  Only punitive damages can curb this type of conduct that operates in reckless disregard for accurate credit reports.

## COUNT III
### Fair Credit Reporting Act
### 15 U.S.C. §1681c-2

73.    Plaintiff incorporates paragraphs one (1) through seventy-two (72) as if fully stated herein.

74.    Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681c-2 by failing block the identity theft related Rocket Loans account from Ms. Harp's credit file upon provision of a police report and her identifying information.

75.    15 U.S.C. 1681c-2 specifically provides:

(a)Block
Except as otherwise provided in this section, a consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer

identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of—

(1) appropriate proof of the identity of the consumer;

(2) a copy of an identity theft report;

(3) the identification of such information by the consumer; and

(4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

76. Pursuant to 15 U.S.C. §1681c-2(c)(1), a CRA may decline to block information only if it determines that the consumer's request is based on a material misrepresentation, made in error, or that the consumer obtained possession of the money at issue in the transaction.

77. If a CRA fails to determine a material misrepresentation, error, or receipt of goods, a CRA cannot decline a request to block without first requesting additional information from the consumer to determine the validity of the alleged identity theft. *See* 12 C.F.R. §1022.3(i)(1)(iii)(A).

78. "[I]f a CRA receives a police report containing detailed information as well as the signature, badge number, or other identifying information for the officer taking the report, it is not reasonable for the CRA to request additional information without 'an identifiable concern,' such as an indication that the report was fraudulent." *Osada v. Experian Info. Solutions, Inc.*, No. 11-C-2856, 2012 WL 1050067, at *3 (N.D. Ill. Mar. 28, 2012) (citing 16 C.F.R. § 603.3(c)(1) (renumbered at 12 C.F.R. § 1022.3(i)(3)(i)).

79. The plain language of Section 1681c-2 is clear and Equifax is on notice of its requirements, both from guidance from the Federal Trade Commission and prior court decisions such as *Osada*.

80. In violation of the FCRA, Equifax willfully and negligently declined to block the reporting of information that Ms. Harp alleged to have resulted from identity theft in violation of 15 U.S.C. §1681c-2(a) despite its receipt of the required documentation from her.

21

81.     Equifax failed to comply with the requirements of 1681c-2(c) for not blocking a disputed trade line with the consumer provided the required items pursuant to 1681c-2(a) and on multiple occasions (June 6, 2025; October 8, 2025 and October 9, 2025) falsely responded that it was not blocking the trade line because she failed to provide all the required elements for the blocking statute and when she did provide them a second time, it repeated the same misleading and deceptive behavior.

82.     Based upon information and belief, Ms. Harp complied with all of the statutory requirements for a block of the Rockloans Marketplace account.  Rather than comply with the statute, Equifax allowed the identity theft related account to remain on Ms. Harp's credit file.

83.     As a result of the violation, Ms. Harp suffered actual damages including time spent addressing the problem, inconvenience, improper denial of access to credit, as well as emotional distress damages with attendant physical manifestations.  In addition, punitive damages are necessary based upon Equifax's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

### **Prayer for Relief**

Wherefore, the Plaintiff prays that the Court award the following relief:

a)     Actual damages based upon Defendant's violations of the FCRA;

b)     statutory damages against Defendant's based upon violations of the FCRA;

c)     punitive damages based upon the violations of the FCRA

d)     costs and reasonable attorneys' fees incurred by the Plaintiff;

e)     prejudgment interest

f)     all other further relief that this Court deems just and proper.

### **DEMAND FOR TRIAL BY JURY**

22

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted,
Susan Harp

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Blankingship & Christiano, P.C.
11862 Sunrise Valley Dr. Suite 201
Reston, Virginia 20191
(571) 313-0412
Fax:(571) 313-0582